And turn to case number 5, Thompson Corrugated vs. Engico S.r.l. These are two appeals, appeal number 23-1302 and 23-2206. Mr. Horvath, we're ready when you are. Good afternoon, Your Honor. Seth Horvath for Engico and may it please the Court. Your Honor, this appeal is from the entry of judgment on a jury verdict. The errors happened on summary judgment before trial. The District Court erred in concluding that the parties entered into a sales representative agreement in 2004. The District Court also erred in concluding that the statute of frauds did not bar the parties' alleged 2018 agreement to extend their relationship into 2021. Engico is seeking the reversal of the judgment and the remand of this case for a new trial. With respect to the contract formation issue, the District Court resolved issues of fact about assent to material contract terms. The material terms of the sales representative agreement include territory, exclusivity, duration, and most importantly, commissions. And commissions were certainly the driving issue here before the District Court. The record shows that this was a case-by-case, sale-by-sale relationship between the parties. There were two sales over a 15-year period before the relationship was terminated in 2019. There were three sales without the plaintiff's involvement starting in 2019. The court used those first two sales between 2005 and 2017 to infer a commission structure for the last three sales that happened in 2019 and 2020. And that's really where the parties part ways here with respect to the discussions on commissions. Is it fair to say the court inferred a commission structure for the last three sales when he sent two of them to trial? Your Honor, there were two commissions that went to trial. But the problem with the District Court's handling of that issue is the District Court found on summary judgment that a contract had been formed. So Engico was barred from arguing at trial based on that partial summary judgment ruling that no contract existed. Although there was an issue tried to a jury regarding the custom and practice as it related to those two commissions, Engico's defense was severely impaired by the summary judgment ruling that happened prior to trial. The District Court and the plaintiffs really rely on two things to come to that conclusion, that there were no issues of material fact regarding the commission structure. Mr. Benzoni's testimony, Mr. Benzoni is the principal of Engico, and the party's course of conduct. And they rely on those two factors to find that the parties agreed to an 8% commission in 2004 and then a sliding scale commission in 2012. The court said no reasonable jury could find the terms of the agreement any different. And we submit to this court that that was erroneous. If you pick apart the evidentiary record, as is required in reviewing a summary judgment, in 2004, Mr. Benzoni caveated the 8% commission so that price adjustments could be made to win business. At the time, Engico was new to the U.S. market. He also limited the commission to machines that were part of Engico's original production. This is part of Mr. Benzoni's deposition testimony. And he also maintained that any commission would be on a case-by-case basis, depending on the terms of the deal. That comes out in his summary judgment affidavit. That also comes out several times throughout the course of his deposition. I don't want to oversimplify matters, but Mr. Benzoni effectively said, an 8% commission sounds good, but I reserve full discretion to change that on a case-by-case basis. And the district court didn't take those facts into consideration when it entered summary judgment on formation before trial. There is also critical evidence in the record about the sliding scale commission. Was the district court supposed to ignore the party's course of conduct? The fact that they talked about 8%, then Thompson paid 8%. They talked about a sliding scale, then Thompson paid a sliding scale. Is your position that the district court should have ignored that? I think, Your Honor, the district court should have acknowledged that the totality of the facts, the conduct, the testimony, and so on, warranted submitting the formation issue to a jury for further consideration. And instead of doing that, instead of allowing the jury to decide where the chips were going to fall with respect to whether a contract had in fact been formed, the court explicitly found no reasonable jury could find the terms of the agreement any different. So the court weighed the evidence on summary judgment to find that contract formation was not an issue to be considered at trial. It, in fact, was not. Mr. Horvath, the standard to determine contract formation is an objective standard, right, not a subjective standard. And so before NJCO paid the 8% for Lauren's paper and paid person to sliding scale for Jayhawk, are there any facts in the record that indicate that before those payments were made, there was any discussion about, as you say, on a case-by-case basis? Oh, well, you know, this is Lauren's paper, and so for Lauren's paper, we'll do the 8%. Oh, this is Jayhawk. Okay, so, you know, it's case-by-case, but for Jayhawk, we'll do the sliding scale. Is there any evidence to the record that those discussions took place? Your Honor, the evidence that I can point to is the evidence of the constant caveatting by Mr. Benzoni that the commissions were to be determined on a case-by-case basis. You see it in his deposition testimony. You see it in his affidavit. You see it in the course of correspondence related to the 2012 discussions on the sliding scale commission. There's very pertinent evidence in the documentary record in July 2012 when Thompson memorializes the party's discussions about the sliding scale commission. There's a notation in Thompson's own records that says, attributed to Mr. Benzoni, let's start this way, and then we will see. It's a conditional statement by Mr. Benzoni about the sliding scale commissions. It happens again in 2015 in additional email correspondence. So if Mr. Benzoni says, let's start this way, and then we'll see, is there ever a point where he goes, whoa, whoa, whoa, whoa, we're not going to do it this way when it came to Jayhawk or when it came to anyone else for that matter? I don't know that there's evidence where he says, no, we're not going to proceed this way, but there is an expression of these caveats throughout the documentary record and in Mr. Benzoni's testimony about his reservation of the right to make a discretionary determination on a deal-by-deal basis whether a particular commission should be paid. And so that's why I submit to the court that's no different from saying, this commission structure sounds good to me. However, I reserve the right on a deal-by-deal basis to propose a different commission structure because I'm uncertain about my entry into this market and how this market works, and I want to have full discretion to maintain a proper business structure with respect to commissions. The other point in the record that's, I think, critical in terms of the material terms of the sales representative agreement is the durational term. There was a discussion here in the district court order about how it was an at-will agreement when the district court determined that there was, in fact, an agreement, and the agreement was formed, and the agreement dictated the course of the party's relationship. The district court was willing to take Illinois law's default setting of an agreement without a durational term being at-will and use that at-will concept to find that the parties had reached a meeting of the minds on the durational term. And we've cited at least two cases in the briefs that support the proposition that an at-will sales representative agreement has an indefinite durational term. Just because a contract is terminable, it will, under Illinois law, doesn't mean there's a sufficiently specific durational term. There's support for that proposition in the Anderson and O'Neill cases. And, Your Honors, I know I only have a short amount of time, so I think I'll reserve my remaining minute for rebuttal unless the court has further questions, and we would ask that the court reverse the judgment and allow the case to be retried. Very well, Mr. Horvath. Thank you, Your Honors. Mr. Glazer. Good morning, Your Honors. Please, the court, pick up, if I may, with Judge Lee's question about evidence of the discussion between trying to make this a case-by-case analysis rather than establishing a commonly used oral agreement, as was the case not only in this instance but in this industry. The testimony, after all, was that it was the regular practice of both parties to use oral agreements rather than reduce the principles to writing. But there is absolutely no evidence, and counsel didn't identify any, of the case-by-case approach other than perhaps the original discussion. We've seen a lot of e-mails. There are a lot going back and forth. Never once do you see in the e-mails after that original 8% deal was struck that we're going to look at these on a case-by-case basis. Counsel said, I wrote this down throughout the documentary record, but that's just simply not the case. If you look through the documentary record, you'll see that what would happen was there was the original 8% agreement. Both sides agreed on that, 8%. And then at NGCO's insistence, and that's the pronunciation we used at trial was NGCO, NGCO's insistence, they wanted to go to a sliding scale to take into consideration some economic concerns, and the parties agreed to the sliding scale. And ever since that sliding scale was put into place, that was the structure that was used. There was never any change to that. It wasn't modified. In the record, there is one attempt to put together a subsequent written agreement that NGCO had drafted that would have changed some of the other terms, but significantly would have left in place the sliding scale commissions that the parties had been operating under. They had been operating under that for some time, of course, ever since 2012. But that is the agreement that was in place. There was no further evidence of the case-by-case, and it is indeed an objective standard. It goes all the way back to Judge Learned Hand, if not before, and we cite to that case in the brief that talks about how it's an objective standard. The parties agreed to 8%. The first sale was made. There was no discussion. There was no complaining. Payment at 8% was made. The second sale, the Jayhawk sale, was made. That was pursuant to the sliding scale. We sent an invoice at the sliding scale rate, and NGCO paid it at the sliding scale rate. That is the objective evidence of performance, validating the terms that had been in place ever since 2012. Then we come to the third sale, the sale that was at issue on summary judgment, also to Lauren's paper, a customer that TCS had brought in. The sale was pursuant to the exact same terms, and if you look at this, the reason why it was such an easy question for the district court is because Mr. Benzoni, who you heard was the principal of NGCO, he agreed to all of this. He agreed that we were still the sales representative at the time of that sale, and he further agreed in his deposition testimony that we were entitled to that commission. He even said he was prepared to pay us that commission, but he claimed that my client wouldn't accept the funds. So there was no issue on either side as to whether or not that money was due under the terms of the party's agreement. They had all agreed it was due. The reason it wasn't paid, according to Mr. Benzoni, was by that time he had started to incur attorney's fees, and with the incursion of attorney's fees, he felt he didn't have to pay the full amount anymore. There's also some evidence in the record that he attached terms when he said he would pay the amount that was due for that third sale to Lawrence Paper, but there's absolutely no disagreement that we had earned the commission pursuant to the terms of the party's existing agreement. As the trial court noted, there seemed to be some disagreement on NGCO's side as to whether oral agreements were valid in Illinois, but that was made very clear that we had an oral agreement, that the terms of it were to be implemented, and that it was a binding agreement on all sides. Can you shift now to the statute of frauds? Sure. The statute of frauds issue, I mean, there's a number of components to that. The statute of frauds argument was waived. They never brought it up in their pleadings. It wasn't pled as an affirmative defense. It's not in their answer. They didn't move for summary judgment on it. The only time it came up was in response to our motion for summary judgment, and the district court noted it was an 11th-hour attempt to put it in there at the end in terms of the position on summary judgment. They never came back and asked for leave to amend their complaint, to add an affirmative defense, or otherwise bring up the statute of frauds. It never came up at trial. We tried this case for a week downstate. If we find that they did preserve that defense, should it have been submitted to a jury then? Absolutely not. The defense itself wouldn't apply because this case is outside the statute of frauds, even if it had been pled. We had full performance by my client. The only aspect of that that was not present was the payment, and that was beyond our control. We had fully performed all of our duties. There's no evidence in the record that suggests that there was any unkept aspect of our performance. We did what we were required to do. We kept working. As the court may have seen from the briefs, we spent over $670,000 in trying to perform and trying to generate sales and promote this company that no one had ever heard of in North America before we took it on. We did everything we could. There's not only is there a full performance, but you can also argue that there's also partial performance. During this time, I'm just curious about this industry. During this 15-year period where there were just two sales before 2019, did Thompson ever have to do any reporting or any proving to Ingeco or Ingeco that it was taking these steps, doing these things to promote Ingeco's machines in the United States? You say Thompson spent all that money doing all these things. What was his obligation during that time to Ingeco to prove that up? Understand, that's not money that an independent sales rep ever seeks to recover. That's the investment that we are prepared to make. There was regular communication. There were email communications back and forth. There were phone calls. There were visits. They would come over here. We would go to Italy. There was all kinds of interactions between us on a regular basis. They knew about all of the sales calls that we were going on. There's a string of emails concerning all of this, and we prepared a list of some 60 prospects that we had called on, so they were kept advised of our efforts. Again, there was never any complaint. There was never any issue with respect to the work we were doing. They knew that we had to pioneer this territory, that it was a competitive marketplace, they had no presence in North America, and that we were going to be the ones to put them on the map, and that's what we did. It's a long process to try and introduce this kind of machine. If the court's not familiar, these corrugated box machines, these are huge machines. There's very few customers for these machines that manufacture cardboard boxes, and we were the ones who introduced the product to the United States marketplace. You don't see anything in the record or in the briefing that suggests that there was any dissatisfaction or grumbling with the performance that was undertaken. We did our job. We did it well. The problem is we didn't get paid for the third sale that was affected. We also didn't get paid for the other two, but that was addressed by the jury, who obviously understood the situation. But as to the summary judgment, the court properly understood that there really wasn't any dispute here, that Benzoni admitted that we were entitled to the funds and that, therefore, the third sale was the easiest one. The other two he said there were issues, so deferred those to the jury. Okay, I understand that. But not as to this one. Counsel's argument is that there should never be a summary judgment. You should never do it because, I think he said, if you look at the totality of events, that's something that should have gone to the jury. Well, that's an argument that could be made in any case, in any summary judgment disposition. You could say, look at the totality and send it to the jury. Well, that's not the rule. The rule is that when there is a basis for summary judgment, when no reasonable jury could rule against us, then summary judgment is properly entered. And that was the case here where Benzoni didn't dispute anything. He admitted in his deposition, he admitted in the testimony, that we're entitled to the funds, that we earned them, that we were the rep, and that he was willing to pay them. We just didn't accept them. That's a summary judgment. That's crying out for summary judgment. If there's any other questions, I'm happy to answer them. Otherwise, I thank the court very kindly. Mr. Horvath, if you could start, how did INJICO preserve its statute of frauds defense? Do you agree that our analysis of that issue returns on how definitive we find the court's ruling, which is restricted to that footnote? I do think that's an important element here. And I think it was preserved insofar as the DeVolk and the Vassar cases come in. Those are those two opinions of this court that we discussed in the briefing. And they make the point that even though it's best to assert a statute of frauds defense in an affirmative defense, it's really a housekeeping matter. And there's a discretionary consideration that goes into whether the side that's responding had an opportunity to fully respond. And here that happened, because when it was raised in response to the motion for summary judgment filed by the plaintiffs, the plaintiffs had an opportunity to file a written response and flesh out why they didn't believe the statute of frauds applied. So based on the Dresser and the DeVolk cases, there's enough there to find that that argument was properly preserved. But then the district court went on to find that the statute of frauds didn't apply. And that's where a clear definitive error occurred. And I wanted to quickly respond to this notion that there was complete performance. And the complete performance exception doesn't affect apply here. At a minimum, there's a question of fact as to whether complete performance happened with respect to the three transactions that are at issue. The record shows that Lawrence Paper didn't want the plaintiffs involved in the first 2019 sale. The record shows the presidential container wasn't even on plaintiffs' list of companies for which they thought a sale was possible. And the record further shows that the Welch packaging machine was sold through NGCO's new representative, Hare, based on Hare's ability to service the machine. So there are questions of fact regarding the applicability of the complete performance exception to the statute of frauds. And I thank the court for letting me go a bit over. And if the court has further questions, I'm happy to address those. If not, we would ask that the court reverse OK, thank you, Mr. Horvath and Mr. Glazer. We'll take the case under advisement.